(No. 21682.—

THE VINCENNES BRIDGE COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(CLEO HOFFMAN, Defendant in Error.)

*Opinion filed February 23, 1933.*

SEYMOUR RIDDLE, and BEN H. TOWNSEND, for plaintiff in error.

P. J. KOLB, for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

This writ of error was awarded on the petition of the Vincennes Bridge Company to review a judgment of the circuit court of Wabash county confirming an award of the Industrial Commission in favor of Cleo Hoffman for damages resulting from an accidental injury. The only question in the case is whether the accidental injury received by Hoffman arose out of and in the course of his employment.

The Vincennes Bridge Company was engaged in the construction of a bridge across the Wabash river from Mt. Carmel, Illinois. Hoffman was employed by the bridge company as a laborer, and on April 17, 1931, was helping to pour concrete in the pier at the west end of the bridge, his particular work being to puddle the concrete—that is, to mix and smooth it after it was poured into the form. The accident occurred on that day but not during the time when he was working. At noon the men were allowed thirty minutes for dinner, but on this day, as they lacked only a little concrete for completing the form and wanted to finish it before they ate, they did not quit work until a few minutes after 12:00 o'clock. There were probably from fifty to seventy men at work on the bridge there on that day, and as the places where most of them lived or boarded were from a half to three-quarters of a mile from their working place, too far to go for dinner and return

within the half hour suspension of work, the larger part of them brought their dinners with them. A building specially intended for a mess hall, about 14 by 20 feet in size, had been constructed about 325 feet from the pier where Hoffman was working, as a place for the men to eat and a shelter from the weather. Other places available for the employees to go into for shelter or for eating their dinners were the cement house, 30 by 60 feet, which was used for storing cement but was never full, and a building from 30 to 50 feet long and from 10 to 15 feet wide, the front part of which was used for an office and the back part for a tool room. There was an addition to this building for a blacksmith shop, about 16 by 20 feet, which was available and contained no dangerous machinery. There was also a gravel tower covering ground approximately 25 feet square, which was used for shelter by a number of the men. Under one edge of it was a concrete mixer but nothing else. Near the pier where Hoffman was working was a hoisting engine used to hoist concrete from the mixer to put in the pier form where Hoffman was puddling the concrete. The witnesses refer in their testimony to the engine room, but as it was described in the testimony and was characterized by one of the witnesses, "there wasn't no room to it; it was just a cover over the engine and had some tarpaulin over the wall as a kind of a protection from the rain and wind." It was the nearest shelter to the pier where Hoffman was working, and some of the men were in the habit of going there to eat their dinners. The day of the accident, April 17, 1931, was cool and rainy, and Hoffman, when the pouring of the concrete was stopped, a few minutes after noon, got his dinner bucket and went around to the engine. He was wet and went there to get dry and warm. The other men of the crew of which he was a member also went around to the engine, as had been their custom in bad weather. When Hoffman arrived there some of the men were seated on the coal pile, others in

various places, and Hoffman went around back of the boiler, behind the engineer, who was sitting in the seat from which he operated the engine, and began to climb up on the engine to sit down on the "niggerhead." He described this operation, the niggerhead and his purpose in these words: "In climbing up where I wanted to go it is practically three or four feet—just high enough where I turned around and pushed myself up on the niggerhead. I could lean up against it with my rump and push up on it to sit down. This engine had a cylinder on both sides and was operated by steam. I got up on the left side, or the up-stream side. On that side there was a fly-wheel. The drum works in the middle and the niggerhead is on the outside of the drum. The niggerhead is just a spool that you take a rope and wrap around it to pull whatever you want to pull, and, of course, it was fastened onto the engine drum. The fly-wheel extended, I reckon, just the width of the shaft, and the spool is probably about so long [indicating]. The fly-wheel was what I caught my foot in, and was about two feet in diameter, and had two open spaces which was practically half of the fly-wheel. I surely must have put my foot in one of the open spaces or my foot wouldn't have got hurt. I didn't particularly know that I put my foot in there until it caught my foot. The fly-wheel is operated by steam. It is the arm of the engine that drives it—that operates the spool—and it is connected direct to the spool. I didn't put my foot in it but in climbing up I walked up to it, backed up against the spool, and to push up I must have got my foot against the fly-wheel and the engine started, and when it started it caught my foot. I stepped this foot back and set my dinner down and caught myself to keep from pulling my foot off. I placed my foot in the fly-wheel in my effort to climb up on this piece of machinery to eat my dinner. My purpose in getting up on this engine was to get out of the rain and thaw out a little bit. I was wet."

The evidence shows a disabling injury to the foot, the period of disability from which had not ceased at the time of the hearing and that the foot was still swollen and oozing pus. The injury occurred, as shown by Hoffman's testimony and the other testimony, under the following circumstances: The engineer in charge of the hoisting engine shut down the operation of the engine a few minutes after the whistle blew at noon and opened the cylinders, opening the pet-cocks to let out the water accumulating from the steam leaking there. This caused some noise by reason of the escaping steam. About five minutes after the pet-cocks were opened the accident happened to Hoffman and the engineer found the pet-cocks closed. He did not know who closed them. The fly-wheel in which Hoffman's foot was caught was about two feet in diameter and had two holes cut in it, each about five inches across. Hoffman placed his foot in the fly-wheel in his effort to climb up on the niggerhead and the engine started and caught his foot.

The decision of the arbitrator found the applicant's average weekly wages to be $17.50 and made an award in his favor of $91.25 for compensation accrued through June, 1931, the remainder of his compensation to be determined at a future hearing under paragraph (b) of section 19 of the Workmen's Compensation act. At the hearing, on review, by the Industrial Commission the testimony of one additional witness was heard and the award of the arbitrator was confirmed.

Hoffman's employment, as he testified, was to do whatever common labor was assigned to him. The particular work he was doing on the day of his injury was puddling concrete. He was not working at anything at the time of his injury. The injury happened on his employer's premises during an interval in his employer's work for the purpose of eating his dinner. He was still, during the interval, under the protection of the Workmen's Compensation act against any injury arising out of and in the course of

his employment. It was no part of Hoffman's work to do anything in connection with or about the hoisting engine. He climbed up on it for his own purpose and not in performing any duty of his employment or anything incidental to it. The words "in the course of" the employment refer to the time, place and circumstances under which the accident takes place; the words "arising out of" the employment refer to the origin or cause of the accident as the result of a risk incidental to the employment which might have been reasonably contemplated by a person entering the employment as incidental to it. (*Dietzen Co.* v. *Industrial Board*, 279 Ill. 11; *Mueller Construction Co.* v. *Industrial Board*, 283 id. 148.) In the latter case we cited as a concrete statement of the law the language of the Supreme Court of Massachusetts in *McNicol's case*, 215 Mass. 497, that an injury arises "out of the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises out of the employment, but it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence."

Where an employee chooses to go to a dangerous place where his employment does not carry him and thereby incurs a danger of his own choosing altogether outside of any reasonable requirement of his employment such risk is not an incident to the employment. The employee may not unnecessarily increase the risk of injury beyond that contemplated in his contract of service or choose an unnecessarily dangerous place or manner for the performance of his service, and there must be a proximately causative relation between the nature of his work and the injury, so that it may be sure that the injury had its origin in a risk connected with the employment, from which the injury, though unforeseen, may after the event be recognized to have flowed as a rational consequence. (*Nelson Construction Co.* v. *Industrial Com.* 286 Ill. 632; *Weis Paper Mill Co.* v. *Industrial Com.* 293 id. 284; *Terminal Railroad Ass'n* v. *Industrial Com.* 309 id. 203; *White Star Coach Lines* v. *Industrial Com.* 336 id. 117; *Herald Printing Co.* v. *Industrial Com.* 345 id. 25.) Among numerous other cases decided on the same principle are *Boorde* v. *Industrial Com.* 310 Ill. 62; *United States Fuel Co.* v. *Industrial Com.* id. 85; *St. Louis and O'Fallon Coal Co.* v. *Industrial Com.* 325 id. 574; *White City Amusement Co.* v. *Industrial Com.* 331 id. 541; *Landon* v. *Industrial Com.* 341 id. 51; *Haggard's case,* 234 Mass. 330.

In climbing about the engine Hoffman unnecessarily placed himself in a dangerous position, as was demonstrated by the injury he received. He was doing nothing which he was directed or employed to do. His negligence was not merely contributory negligence in the performance of his work, but was an unnecessary exposure to danger entirely aside from the work he was employed to do. The award of the commission was manifestly against the evidence, and the court erred in not setting it aside.

The judgment is reversed and the award of the commission is set aside.

*Judgment reversed and award set aside.*